UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>     Plaintiff,<br><br>  v.<br><br>LUIS ANTONIO RUIZ,<br><br>     Defendant. | CASE NO. CR20-5002 BHS<br><br>ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS |

This matter comes before the Court on Defendant Luis Antonio Ruiz's ("Ruiz")

motion to suppress, Dkt. 28, and memorandum of law in support of the motion, Dkt. 29.[1]

The Court has considered the pleadings filed in support of and in opposition to the

motion, the testimony given at the evidentiary hearing held February 20, 2020, the post-

hearing pleadings and the remainder of the file and hereby denies the motion for the

reasons stated herein.

## I. PROCEDURAL HISTORY

On September 10, 2019 Ruiz was charged by complaint with Possession of Heroin

with Intent to Distribute in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(i). Dkt. 1.

On January 30, 2020 Ruiz filed a motion to suppress "all evidence seized from his

---

[1] The Local Rules require movants to submit argument in support of a motion in the same document as the motion and to include in the caption of the motion the date the motion is noted for consideration by the Court. Local Rules W.D. Wash. LCrR 12(b)(1).

person, his luggage, and his phone in Tacoma, Washington on September 9, 2019." Dkt. 28. On February 7, 2020, the Government responded. Dkt. 31. On February 12, 2020, Ruiz replied. Dkt. 34.

On February 20, 2020, the Court held an evidentiary hearing on the motion. Dkt. 38. The Court heard testimony from five law enforcement officers and directed the parties to file post-hearing briefing. *Id.* Ruiz did not present witnesses or testify. *Id.*

On February 24, 2020, Ruiz filed a supplemental memorandum. Dkt. 39. On February 28, 2020, the Government filed a supplemental memorandum. Dkt. 41. On March 2, 2020, Ruiz replied to the Government's supplemental memorandum. Dkt. 42.

## II.   FACTUAL BACKGROUND

In early September 2019, Special Agent Nathan Clammer ("Agent Clammer") of United States Homeland Security Investigations ("HSI") received a tip from a special agent from the HSI Los Angeles office. Dkt. 1, ¶ 7. That agent told Agent Clammer that a confidential source who provided reliable information for the agent in the past had advised that an unknown male who was a "Paisa" would be traveling from Los Angeles, California to Seattle, Washington via a Greyhound bus leaving Los Angeles on September 8, 2020 and arriving in Seattle on September 9, 2020.[2] *Id.* ¶¶ 7–8. The informant further reported that the unknown male would be carrying two kilograms of heroin molded to and carried on his body. *Id.* ¶ 8. Agent Clammer did not speak directly to the informant and knew nothing about his or her background except that he or she had

_____

[2] The parties agree that a "Paisa" is a slang term for a Hispanic or Mexican-American person, particularly someone who is affiliated with a gang. Dkt. 1, ¶ 8; Dkt. 29 at 2 n.1.

provided reliable information to the agent in the Los Angeles HSI office. *Id.* ¶ 7. The fact

that the informant had provided reliable information to another agent was sworn to by

Agent Clammer in the complaint, *id.*, and uncontested at the evidentiary hearing.

Agent Clammer conducted an online search confirming that a Greyhound bus

would leave Los Angeles and arrive in Seattle on September 9, 2020. *Id.* ¶ 9. Before

arriving in Seattle, the bus was due to stop in Tacoma, Washington at 12:55 p.m. *Id.*

On September 9, 2020, Agent Clammer and five other law enforcement officers

met the bus at the Greyhound bus station in Tacoma. The other officers present were:

Special Agent Michelle Hardin-Pineda ("Agent Hardin") of HSI, Special Agent Joe

Parker ("Agent Parker") of the Drug Enforcement Administration, Officer Aaron

McCauley ("Officer McCauley") of the Seattle Police Department, K-9 Officer Joe

Mettler ("Officer Mettler") of the Tacoma Police Department, and Task Force Officer

Trooper Derek Sharf ("TFO Scharf") of the Washington State Patrol. Each officer except

TFO Sharf testified at the evidentiary hearing. Dkt. 38.

At the hearing, the testimony was as follows: Agent Clammer boarded the bus

with Agent Hardin and TFO Scharf, all of whom were dressed in plain clothes. Dkt. 48,

Transcript of Evidentiary Hearing ("Evid. Hrg. Tr.") at 8–9. Based on the informant's tip,

the drug courier that the agents were looking for on the bus was a "Paisa," which the

agents understood to mean a Hispanic male commonly associated with Hispanic prison

gangs. *Id.* at 75, 76, 97, 108. Agent Clammer's badge was visible onboard the bus, but

the other two agents' badges were not. *Id.* Each officer was armed with a holstered

weapon, but no officer openly drew or displayed his or her weapon. *Id.* at 31.

Agent Clammer walked down the aisle of the bus, looking at the various individuals. *Id.* at 8. Agent Hardin followed behind Agent Clammer, and TFO Scharf stood in the front of the bus near the driver, in "an area where you can stand . . . without impeding anyone getting on or off the bus." *Id.*

Initially, Agent Clammer contacted a person referred to at the hearing as "Man 1." *Id.* at 9–10. Man 1 sat "one seat further back and on the other side" of the aisle from Ruiz. *Id.* at 10. While Agent Clammer spoke to Man 1 on the bus, Agent Hardin was "secreted" into an empty seat and was not blocking the aisle. *Id.* at 10–11.

Man 1 appeared to be Hispanic. *Id.* at 20. Agent Clammer initially believed Man 1 could be the subject of the tip because he was speaking in Spanish on the phone without looking at Agent Clammer; it appeared to Agent Clammer that Man 1 was purposefully avoiding him. *Id.* at 79. Agent Clammer asked to see Man 1's bus ticket but Man 1 had difficulty responding, likely because he did not speak English fluently. *Id.* at 20, 80. When Agent Clammer first asked Man 1 for his bus ticket, Ruiz had it. *Id.* at 23. Ruiz told Agent Clammer that he was "interpreting" the bus ticket for Man 1. *Id.* at 80. Agent Hardin remembers Ruiz handing Man 1's bus ticket back to him at some point. *Id.* at 23.

Without using physical force and using a normal tone of voice, Agent Clammer asked Man 1 to speak outside the bus. *Id.* at 11–12. Man 1 complied, and Agent Hardin followed him and Agent Clammer off the bus, there, the two officers stood "outside the bus on the little sidewalk area" trying to discern Man 1's travel to see if it was consistent with the subject of the tip. *Id.* at 12. Man 1 handed Agent Clammer his phone, and Agent Clammer spoke on the phone to the person Man 1 had been talking to, his father, for

approximately one minute. *Id.* at 12, 104. After approximately 2–3 minutes Agent

Clammer and Agent Hardin determined that Man 1's travel plans did not match the travel

plans of the drug courier because Man 1 was not from the Los Angeles area and was

traveling past Seattle. *Id.* at 12–13, 81–82. Man 1 re-boarded the bus. *Id.* at 12.

Agent Clammer, Agent Hardin, and TFO Scharf also re-boarded the bus. *Id.* This

time Agent Hardin stayed at the front of the bus where the bus driver is "but off to the

side." *Id.* at 13. Agent Clammer went towards the back of the bus and began speaking to

Ruiz; TFO Scarf was a "[c]ouple seats back . . . . tucked into the seats." *Id.* at 14. At this

point Agent Clammer and TFO Scharf were each behind Ruiz's seat, which left the aisle

to the exit of the bus clear. *Id.* Agent Hardin testified that there was at least one other man

on the bus who appeared to be of Hispanic origin but who was not contacted. *Id.* at 26.

Agent Hardin believed that Ruiz might fit the description of the drug courier

provided by the confidential informant because "[h]e had a facial tattoo that I had seen

before on individuals who had spent time in prison." *Id.* at 32. Agent Hardin saw Ruiz's

tattoo the first time she boarded the bus. *Id.* Agent Hardin communicated the fact that she

had seen the tattoo and her impressions of what the tattoo meant to Agent Clammer

before he boarded the bus for the second time. *Id.* at 32, 82. Agent Clammer testified that

the fact that Agent Hardin had observed the tattoo was significant to him because it "fit

the person I was looking for, the description that had been made to me by a Hispanic

criminal as the type of thing that a paisa would have." *Id.* at 82.

Agent Hardin testified that from her vantage point at the front of the bus, Agent

Clammer was speaking to Ruiz in a "normal conversation" tone. *Id.* at 13. Agent

Clammer testified that he was a little "thrown off" because initially, he didn't think Ruiz was Hispanic. *Id.* at 83. Agent Clammer testified that Ruiz handed him his identification voluntarily. *Id.* Agent Clammer saw that Ruiz had what appeared to him to be a Hispanic name after looking at his identification. *Id.* Agent Clammer asked Ruiz about his travel plans and learned that he was coming from Los Angeles and going to Seattle. *Id.* at 84. Agent Clammer testified that he asked Ruiz if he had any luggage, and when Ruiz indicated that he had some above his seat, Agent Clammer asked him if he minded taking it off the bus with him and that Ruiz took it off the bus himself voluntarily. *Id.* at. 86. Agent Hardin testified that she saw Agent Clammer and Ruiz "start to move forward to get off the bus" and that Ruiz grabbed his bag from "up above," carrying it off the bus himself. *Id.* at 13–15. No officer made physical contact with Ruiz or his luggage. *Id.* After getting off the bus and while within Ruiz's earshot, Agent Clammer directed Agent Hardin to hold the bus so it would not leave. *Id.* at 15.

The bus had stopped in Tacoma next to "a parking lot right there that gives you a little cover." *Id.* at 15. The back of the bus was "basically right at" the opening to the parking garage, about 20 feet from the front of the bus. *Id.* at 16. Agent Clammer walked with Ruiz, who carried his bag, until they were "just into" the parking garage at its entryway. *Id.* at 87.

The entryway to the parking garage was "ten to fifteen feet wide" and the group was "on the left side of that." *Id.* at 89. "There is a wall on the left side of the entryway 'parallel' to the group." *Id.* There was "no real wall on the right side" of the entryway. *Id.* Inside the entrance to the parking structure on the left side, Ruiz was "probably standing

1  about four feet away from the wall" with Agent Clammer standing two to three feet away

2  from him. *Id.* at. 88, 90. TFO Scarf stood slightly behind Agent Clammer immediately to

3  his left. *Id.* at 88. Two other officers, Agent Parker and Officer Mettler, were "ten to 15

4  feet" out from Ruiz and Agent Clammer. *Id.* at 57. Ruiz was not handcuffed. *Id.* at 56.

5      Agent Clammer first asked Ruiz if he had drugs with him; Ruiz responded that he

6  did not. *Id.* at 88. Agent Clammer then asked Ruiz if he could search his bag, and Ruiz

7  responded that he could. *Id.* Agent Clammer testified that at that point, TFO McAuley

8  "walked up from my left and put his hand out and made a motion to Mr. Ruiz, and Mr.

9  Ruiz handed the bag to TFO McCauley." *Id.* After TFO McAuley "took the bag away to

10  search it" Agent Clammer asked Ruiz if he "could search his person." *Id.* at 91.

11      Ruiz asked "why." *Id.* Agent Clammer explained that many people transport drugs

12  on their persons. *Id.* Ruiz said "Yes." *Id.* Agent Clammer testified that he did not know

13  what Ruiz meant, so he clarified by saying, "Yes, I can search you?" *Id.* Ruiz again said

14  "Yes" and, without prompting, turned around and put his hands up about shoulder height.

15  *Id.* at 91–92. On cross-examination Agent Clammer testified that he clarified whether he

16  could search Ruiz's person twice, the second time asking "so you don't mind?" *Id.* at

17  106. Agent Clammer conceded that he had posed the question to Ruiz in the negative and

18  Ruiz had responded affirmatively by saying "Yeah." *Id.* at 92, 106. Agent Clammer

19  explained that the non-verbal portion of Ruiz's response led him to believe Ruiz had

20  consented as follows: "As he said, 'Yeah,' he lift[ed] his arms up, which he had not done

21  before, and turn[ed] around letting me, at this point, have easy access to pat him down."

22

1   *Id.* at 106–07. Agent Clammer "interpreted both the verbal and the non-verbal as

2   consent." *Id.* at 107.

3       The first place Agent Clammer touched performing the pat-down was the middle

4   of Ruiz's back, where he "immediately felt packages." *Id.* at 92. Agent Clammer made

5   the decision to arrest Ruiz "at the time [Agent Clammer] felt something hard on his

6   back." *Id.* at 100. Agent Clammer testified that while he did not know precisely what the

7   "hard object" he felt on Ruiz's back was, he realized "there was some type of packages

8   affixed" there. *Id.* at 101.

9       Agent Clammer believed that his pat-down of Ruiz was happening simultaneously

10   with Agent McAuley's search of Ruiz's bag, but Agent Clammer "was not paying

11   attention specifically to what Agent McAuley was doing." *Id.* at 92–93. While Agent

12   Clammer was busy with Ruiz, Agent McAuley found a package containing an unknown

13   white substance in Ruiz's bag. *Id.* at 66. Agent McAuley "told Agent Clammer" about

14   the white powder. *Id.* at 67.

15       Officer Mettler and his certified K-9 partner Ruby were also present. Officer

16   Mettler retrieved Ruby to search Ruiz's bag "after consent was obtained" to search the

17   bag. *Id.* at 93. Ruby alerted on Ruiz's bag "for the presence of the odor of narcotics." *Id.*

18   at 53. Agent Clammer testified that Ruby alerted on the bag "after" he had made the

19   decision to arrest Ruiz. *Id.* at 93. Agent Clammer further testified that he believed Ruiz

20   was handcuffed before Agent McAuley found the white powder in his bag. *Id.* at 94.

21       After arrest Ruiz was transported to the Tacoma Police Department, where he

22   "voluntarily . . . ." signed a written consent to search form. *Id.* at 94–95. A search of

Ruiz's person revealed "four packages of heroin under a girdle type garment, which held the packages tightly against his body." Dkt. 1, ¶ 14.

### III.  DISCUSSION

The Fourth Amendment permits brief investigative stops when a law enforcement officer has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–418 (1981); *see also Terry v. Ohio*, 392 U.S. 1, 21–22 (1968). The "reasonable suspicion" necessary to justify an investigative stop "is dependent upon both the content of information possessed by police and its degree of reliability." *Alabama v. White*, 496 U.S. 325, 330 (1990). The standard considers "the totality of the circumstances—the whole picture." *Cortez*, 449 U.S. at 417. Although a mere "hunch" does not create reasonable suspicion, *Terry*, 392 U.S. at 27, the level of suspicion the standard requires is "considerably less than proof of wrongdoing by a preponderance of the evidence," and "obviously less" than is necessary for probable cause, *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

In this case, Ruiz moves to suppress evidence resulting from the search of his person, luggage, and phone. Dkt. 28. He argues that law enforcement seized him, that the seizure was without reasonable suspicion, that his consent to search was invalid, and that his arrest was not supported by probable cause. *Id.*; *see also* Dkts. 39, 41.

**A.    Seizure**

Viewing the totality of circumstances surrounding the incident, a seizure occurs when a reasonable person would have believed that she was not free to leave. *Brendlin v. California*, 5151 U.S. 249, 255 (2007) (quoting *United States v. Mendenhall*, 446 U.S.

1    544, 554 (1980)). The totality of the circumstances includes the "collective knowledge of

2    the officers involved." *United States v. Hall*, 974 F.2d 1201, 1204 (9th Cir. 1992)

3    (quotation omitted). It is well established that law enforcement officers may contact

4    passengers on public buses without the encounter developing into a seizure "provided a

5    reasonable person would understand that he or she is free to refuse." *United States v.*

6    *Drayton*, 536 U.S. 194 (2005). Another way to view this question is by asking whether "a

7    reasonable person would feel free to decline the officers' requests or otherwise terminate

8    the encounter." *Brendlin*, 551 U.S. at 249 (quoting *Florida v. Bostick*, 501 U.S. 429, 435–

9    36 (1991)).

10           In *Drayton*, the United States Supreme Court held that:

11           police did not seize respondents when they boarded the bus and began
              questioning passengers. The officers gave the passengers no reason to
12           believe that they were required to answer the officers' questions. When
              Officer Lang approached respondents, he did not brandish a weapon or
13           make any intimidating movements. He left the aisle free so that respondents
              could exit. He spoke to passengers one by one and in a polite, quiet voice.
14           Nothing he said would suggest to a reasonable person that he or she was
              barred from leaving the bus or otherwise terminating the encounter.

15

      *Drayton*, 536 U.S. at 203–04. The Court finds that the facts as set forth in part II of this
16
      Order regarding Agent Clammer's contact with Ruiz while onboard the bus are analogous
17
      to the above quoted facts and findings from *Drayton*. Therefore, Ruiz correctly concedes,
18
      Dkt. 29 at 12, and the Court agrees, that he was not seized within the meaning of the
19
      Fourth Amendment when Agent Clammer questioned him on the bus about his travel
20
      plans and identity. *Drayton*, 536 U.S. at 203–04; *see also Bostick*, 501 U.S. at 435–36
21
      (police contact in the crowded confines of a public bus did not constitute seizure).
22

1    Nonetheless, Ruiz argues that the encounter developed into a seizure when law

2    enforcement attempted to dictate or control his movements by asking him to leave the bus

3    with his luggage, walking with him approximately twenty feet down the length of the bus

4    and into the entryway to the parking garage, and continuing to question him in that

5    location. *Id.* at 10–12 (relying on *Brendlin*, 551 U.S. at 257).

6    The issue in *Brendlin* was whether police seized a passenger in a private vehicle

7    when an officer initiated a traffic stop of the vehicle. *Brendlin*, 551 U.S. at 247. *Brendlin*

8    is inapposite to the instant case involving a public bus and a tip originating from a

9    confidential informant. Instead, the Court finds that *Mendenhall* is a better authority.

10   *Mendenhall* involved a woman traveling at the airport. *Mendenhall*, 446 U.S. at 546.

11   Agents approached her because her conduct appeared "to be characteristic of persons

12   unlawfully carrying narcotics." *Id.* at 547. The agents spoke with her for a few minutes,

13   asked her for her identification, then asked if she would accompany them to an office in

14   the airport for further questioning. *Id.* at 548. Agents escorted her to the office "located

15   up one flight of stairs about 50 feet from where [Mendenhall] has first been approached .

16   . . ." *Id.* She agreed to go with the agents to the office, and, once there, agreed to a search

17   underneath her clothing. *Id.* at 548–49.

18   The Government cites *Mendenhall* for the proposition that no seizure occurred in

19   this case. Dkt. 31 at 5. Defense, however, aptly points out that *Mendenhall* was a plurality

20   opinion where the majority holding that a seizure did not occur commanded only two

21   votes. Three other justices assumed without deciding that a seizure had occurred. The

22   four remaining justices would have held that Mendenhall was seized. Thus, like the

1  justices in the concurring opinion, this Court will assume without deciding that Ruiz was

2  seized when law enforcement contacted him in a public location and then escorted him to

3  another location out of public view for the purpose of questioning.

4      Regardless, Ruiz's seizure at the entryway to the parking structure was justified by

5  reasonable suspicion. *Mendenhall*, 446 U.S. at 560–66 (Powell, J., concurring)

6  (reasonable suspicion existed to question Mendenhall at the airport based on

7  Mendenhall's travel patterns and drug courier profiles). In this case, Ruiz's presence on

8  the bus that was the subject of the tip, his travel pattern, the tattoos on his face, and the

9  fact that he appeared to be a Hispanic male all matched the information provided by the

10 informant to the agent at the Los Angeles HSI office. Moreover, while the informant's

11 criminal history and basis of knowledge to provide the tip is unknown, the agents in this

12 case knew that he or she had provided reliable information in the past. *United States v.*

13 *Rowland*, 464 F.3d 899, 910 (9th Cir. 2006) (citing *Florida v. J.L.*, 529 U.S. 266, 271

14 (2000)) (tip from informant who has previously provided reliable information holds more

15 weight than tip from first-time informant). Although reliability is the hallmark of

16 probable cause and reasonable suspicion, *Illinois v. Gates*, 462 U.S. 213 (1983), even a

17 tip from an anonymous person can be reliable in support of reasonable suspicion if the tip

18 indicates knowledge of a suspect's affairs and predicts their future behavior, *United*

19 *States v. Navarette*, 572 U.S. 393 (2014); *Alabama v. White*, 496 U.S. 325 (1990). That is

20 exactly what occurred in this case when the confidential informant predicted the specific

21 bus that the drug courier would arrive on, the drug courier's travel plans, his sex and

22 background as a Hispanic male belonging to or holding himself out as a member of a

prison gang, and the manner in which the courier would carry the heroin (on his body).

Therefore, reasonable suspicion supported Ruiz's detention in the entryway of the

parking garage.

Ruiz argues that the only conduct officers observed was him sitting in a seat on the

bus, "conduct that does not give rise to reasonable suspicion with or without the officer's

training and experience." Dkt. 34 at 7. The Court disagrees. Instead, Agent Clammer and

Agent Hardin observed Ruiz sitting on the bus that was the subject vehicle of the tip, with

facial tattoos, travel plans, and an assumed sex and ethnic background that, in light of

Agent Clammer's experience and as communicated to Agent Hardin, were consistent

with the information about the male "Paisa" who the informant said would be traveling

on the bus. Moreover, Agent Clammer's observations were corroborated by his

experience; he knew that a "Paisa" might have facial tattoos from prison and/or

demonstrate connection to a prison gang. Given these facts as established at the

evidentiary hearing, Ruiz's assertion that he was racially profiled for nothing more than

"Riding While Brown," Dkt. 34 at 8, is not well taken.[3] The agents had particularized,

articulable reasons to suspect that Ruiz was the drug courier they sought aboard that

specific bus on September 9, 2020, which justified his seizure under the reasonable

suspicion standard.

---

[3] The Court further notes that it is permissible to consider a suspect's racial or ethnic
characteristics for purposes of determining whether the reasonable suspicion and/or probable
cause standards are met. *United States v. Lopez*, 482 F.3d 1067, 1074 (9th Cir. 2007); *United
States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982). Of course, racial or ethnic
characteristics, standing alone, will never support the particularized suspicion necessary to meet
either standard. *Id.*

**B.      Arrest**

The Court also concludes that Ruiz's arrest was supported by probable cause.
Probable cause is established "when, 'under the totality of circumstances known to the
arresting officers, a prudent person would have concluded that there was a fair probability
that [the suspect] had committed a crime.'" *United States v. Lopez*, 482 F.3d 1067, 1072
(9th Cir. 2007) (citation omitted). In this case, the Court finds that Ruiz consented to be
searched as demonstrated by his verbal and his non-verbal responses to Agent Clammer
detailed extensively in part II of this Order. After Ruiz consented to a pat-down, Agent
Clammer's suspicion rose to meet the probable cause standard when, in addition to the
facts supporting his reasonable suspicion of Ruiz as detailed above, he touched the
middle of Ruiz's back and "immediately felt packages." Evid. Hrg. Tr. at 92. While
Agent Clammer did not know precisely what the "hard object" he felt on Ruiz's back
was, he testified that he instantly realized "there was some type of packages affixed"
there. *Id.* at 101. A prudent person would conclude there was a fair probability that the
"packages" Agent Clammer felt "affixed" to Ruiz's body, carried exactly as the
confidential informant had described, contained illegal drugs. *Lopez*, 482 F.3d at 1072.
Thus, probable cause existed to arrest Ruiz. Because probable cause to arrest existed at
the moment Agent Clammer felt the packages on Ruiz, the Court further concludes that
the plain feel doctrine is inapplicable.

Finally, the Court will address the Government's argument that even if Agent
Clammer alone had not developed probable cause, TFO McAuley's discovery of the
white powder in Ruiz's bag brought the fact of the existence of the white powder into the

1  collective knowledge of the agents, whether or not it was communicated to Agent

2  Clammer. Dkt. 41 at 1–4 (relying on *United States v. Ramirez*, 473 F.3d 1026, 1032 (9th

3  Cir. 2007) (courts "look to the collective knowledge of all the officers involved" in the

4  investigation, even information that is "not communicated to the officer" who made the

5  decision to detain) (emphasis added)). TFO McAuley's discovery of the white powder in

6  Ruiz's bag does not support a finding of probable cause to arrest based on the agents'

7  collective knowledge in this matter, however, because Agent Clammer testified that TFO

8  McAuley discovered the white powder after he decided to arrest Ruiz. Evid. Hrg. Tr. at

9  93–93. Thus, the fact of the white powder was not "in" the agents' collective knowledge

10  prior to Ruiz's arrest, whether or not the fact of the white powder was communicated to

11  Agent Clammer as the arresting officer.

12        Because the Court has concluded that reasonable suspicion to detain and probable

13  cause to arrest existed, it does not reach the Government's argument that the evidence

14  should not be suppressed under the "inevitable discovery" exception to the exclusionary

15  rule as stated in *Nix v. Williams*, 467 U.S. 431, 444 (1984).

16                                **IV.  ORDER**

17        Therefore, it is hereby **ORDERED** that Ruiz's motion to suppress, Dkt. 28, is

18  **DENIED**.

19        Dated this 12th day of March, 2020.

20

21
                                        BENJAMIN H. SETTLE

22                                          United States District Judge